**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SOLANGE TRONCOSO,
*on behalf of herself and all others similarly situated,*

                            Plaintiff,

                  v.

TGI FRIDAY'S, INC.,
INVENTURE FOODS, INC., and
UTZ QUALITY FOODS, LLC

                          Defendant.

Case No.: 1:19-cv-02735(KPF)

Hon. Katherine Polk Failla

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, Second Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181

*Attorneys for Plaintiff and the Class*

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................................. i

INTRODUCTION ................................................................................................................ 1

ARGUMENT ....................................................................................................................... 4

   I.   PLAINTIFF HAS ADEQUATELY PLED CLAIMS UNDER NY GBL §§ 349–50 ........ 4

      A. The Products Are Not Potato Skins .......................................................................... 5

      B. The Reasonable Consumer Would Be Deceived by the Products' Labeling ..........11

        1. It Is Reasonable to Expect That the Products Contain Genuine Potato Skins
          Derived from TGIF's Appetizer Classic…………………………………………12

        2. It Is Reasonable to Expect That the Products Taste Like a Snack Food
          Equivalent of TGIF's Appetizer Classic…………………………………………13

        3. Defendants' "Gas Station" Argument Presents a Factual Question Not
          Resolvable on a Motion to Dismiss…………………………………………….....14

        4.The Nutritional Value of Potato Skins Is Material………………………………15

   II.   PLAINTIFF HAS ADEQUATELY PLED A COMMON LAW FRAUD CLAIM......... 16

   III.   PLAINTIFF HAS STATED CLAIMS AGAINST TGIF................................................. 17

   IV.   PLAINTIFF HAS STATED CLAIMS AGAINST UTZ................................................. 17

   V.   PLAINTIFF HAS STANDING TO SEEK INJUNCTIVER RELIEF ............................ 18

   VI.   NY GBL STATUES MAY BE APPLIED EXTRATERRITORIALLY ........................ 20

CONCLUSION ..................................................................................................................21

# TABLE OF AUTHORITIES

*Ackerman v. Coca-Cola Co.*,
  2013 U.S. Dist. LEXIS 184232, 2013 WL 7044866 (E.D.N.Y. 2013) ................................... 18

*Alaei v. Kraft Heinz Food Co.*,
  No. 15-CV-2961, 2016 Dist. LEXIS 63914 (S.D. Cal. Apr. 22, 2016) ................................ 7, 8

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S. Ct. 1937 (2009) ..................................................................................... 2

*Belfiore v. Procter & Gamble Co.*,
  No. 15-CV-5405, 2016 WL 5678474 (E.D.N.Y. Sep. 30, 2016) ........................................ 4, 18

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................................ 2

*Belfiore v. Procter & Gamble Co.*,
  311 F.R.D. 29 (E.D.N.Y. 2015) .............................................................................................. 5

*Bowring v. Sapporo U.S.A., Inc.*
  234 F. Supp. 3d 386 (E.D.N.Y. 2017) ................................................................................. 4, 5

*Fortyune v. American Multi-Cinema, Inc.*,
  2002 U.S. Dist. LEXIS 27960, 2002 WL 32985838 (C.D. Cal. 2002) ................................... 20

*F.T.C. v. Cyberspace.com, LLC,*
  453 F.3d 1196 (9th Cir. 2006) .............................................................................................. 15

*Henderson v. Gruma Corp.*,
  2011 U.S. Dist. LEXIS 41077, 2011 WL 1362188 (C.D. Cal. 2011) ..................................... 19

*Koehler v. Litehouse, Inc.*,
  2012 U.S. Dist. LEXIS 176971, 2012 WL 6217635 (N.D. Cal. 2012) ................................... 19

*Langan v. Johnson & Johnson Consumer Cos.*,
  897 F.3d 88, 92-93 (2d Cir. 2018) ........................................................................................ 20

*Maurizio v. Goldsmith*
  230 F.3d 518, 521 (2d Cir. 2000) ........................................................................................... 4

*Orlander v. Staples, Inc.*,
  802 F.3d 289, 300 (2d Cir. 2015) ........................................................................................... 4

*Parent v. Millercoors LLC*,
  No. 15-CV-1204, 2016 WL 3348818 (S.D. Ca. June 16, 2016) ............................................. 17

*Parks v. Ainsworth Pet Nutrition, LLC*,
  377 F. Supp. 3d 241 (S.D.N.Y. 2019) ..................................................................................... 8

*Raines v. Byrd,*
   521 U.S. 811 (1997) ............................................................................................ 19

*Ries v. Arizona Bevs. USA LLC,*
   287 F.R.D. 523 (N.D. Cal. 2012) ...................................................................... 19

*Suarez v. Cal. Nat. Living, Inc.,*
   2019 U.S. Dist. LEXIS 34634 (S.D.N.Y. 2019) .................................................. 4

*Williams v. Gerber Prods. Co.*
   552 F.3d 934 (9th Cir. 2008) ............................................................................. 15

**Statutes**

NY GBL § 349 ................................................................................................ passim

NY GBL § 350 ................................................................................................ passim

**Rules**

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 2

## INTRODUCTION

Plaintiff SOLANGE TRONCOSO ("Plaintiff TRONCOSO," or "Plaintiff") hereby respectfully submits this Memorandum of Law in Opposition to Defendant TGI FRIDAY'S, INC. ("Defendant TGIF," or "TGIF"), Defendant INVENTURE FOODS, INC. ("Defendant "INVENTURE" or "INVENTURE"), and Defendant UTZ QUALITY FOODS, LLC's ("Defendant UTZ," or "UTZ") (collectively, "Defendants") Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss ("Def. Mem.")

On March 27, 2019, Plaintiff TRONCOSO filed a Class Action Complaint (the "Compl.") seeking redress for, and a stop to, Defendant TGIF's unlawful business practices regarding the advertising, marketing, and sale of its deceptively labeled "TGI Friday's Potato Skins Snacks" products, which are sold in a variety of flavors, including "Bacon Ranch," "Cheddar & Bacon," and "Sour Cream & Onion" (individually, a "Product"; collectively, the "Products"). *See* Compl. ¶ 4. On July 11, 2019, Plaintiff TRONCOSO filed her First Amended Class Action Complaint (the "Am. Compl.") to supplement her original allegations, and to add Defendants INVENTURE and UTZ to the instant action due to their involvement in the manufacturing, advertising, sale, and distribution of the Products. On September 17, 2019, Defendants filed their Motion to Dismiss, which Plaintiff here opposes.

This case centers on Defendants' unequivocal representations that the Products are "Potato Skins." when in fact they are not. The Products' front-package labeling prominently bears Defendant TGIF's logo and states "POTATO SKINS" just above a picture of what appears to be the same. *See* Am. Compl., Ex. A at 1, 3, 5. Upon viewing this labeling, any consumer would reasonably believe that the Products are potato skins. However, the Products are not

potato skins. Not only are they not potato skins, as the reasonable consumer would expect, they do not even contain potato skins as one ingredient among others.

Plaintiff TRONCOSO suffered economic injury when she paid for a product whose qualities were inferior to the ones represented by Defendants—that is, she did not receive potato skins despite Defendants' unambiguously labeling the Products as such. Plaintiff TRONCOSO has brought this class action against Defendants on behalf of herself and all other consumers who relied on Defendants' deceptive labeling when deciding to purchase the Product for personal consumption (the "Class").

To prevail on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff need only assert factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The plaintiff's claim for relief must be "plausible on its face." *Id*. at 570. and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557). A claim has facial plausibility "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Furthermore, "[t]he plausibility standard is not akin to a 'probability requirement.'" *Id.*, quoting *Twombly*, 550 U.S. at 556. A plaintiff must only "nudge[]" his or her allegations "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Plaintiff more than satisfies this standard, given Defendants' own admission that the Products are not potato skins but are rather manufactured in such a way as to generate the appearance thereof, in the knowledge that the Product's association with TGIF—a potato skins trailblazer—will lend credibility to Defendants' deceptive misrepresentations. Defendant TGIF itself touts its reputation as *the* business entity responsible for popularizing potato skins. *See* Am.

Compl. ¶ 59 (Defendant TGIF describing how it "claims to have come up with the potato skin in 1974"). *See also id.* ¶ 37 ("[I]t wasn't until [TGI] Friday's put [potato skins] on the menu in 1974 that they turned into a restaurant staple.") (quoting *The Cooking Channel* video at 0:22).

Faced with their own damning admissions, Defendants are left with the absurd argument that reasonable consumers somehow would not expect a product that (1) is labeled "Potato Skins," (2) is designed to look like potato skins, and (3) is associated with TGIF, to actually consist in potato skins. The suggestion is ridiculous on its face and is further belied by Defendants' own marketing. For instance, TGIF's seller webpage on Amazon claims: "TGIF Fridays Cheddar and Bacon Potato Skins feature tasty potatoes *and real potato skins*." *See* Am. Compl. ¶ 54 (emphasis added). Defendants could not be more explicit. This claim that the Products are "real potato skins" demonstrates that a reasonable consumer would believe the Products to consist in this, since TGIF would not be marketing the Products through representations that it thought would be routinely disbelieved by consumers. Defendants advance their reasonable consumer argument with the strawman that no reasonable consumer would believe that the Products are *identical* to the potato skins ordered at TGIF restaurants. But Plaintiff never claimed so much and has all along alleged the reasonable belief that the Products are *derived* from the potato skins sold at TGIF restaurants, which they are not in any way, even though Defendants go out of their way to reinforce precisely this impression. Hence, for example, Defendant INVENTURE'S characterization of the Products as "a more convenient, crunchier spin on th[e potato skins] appetizer classic." *See* Am. Compl. ¶ 37 (quoting *Potato Skins: Chips: Inventure's Potato Skin Chips are made from—what else? Corn, of course* at 0:22, THE COOKING CHANNEL (Mar. 23, 2015) (hereinafter, "*The Cooking Channel* video," or the "video").

## ARGUMENT

## I.  PLAINTIFF HAS ADEQUATELY PLED CLAIMS UNDER NY GBL §§ 349–50

New York General Business Law ("NY GBL") § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." NY GBL § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." To establish a prima facie claim under NY GBL § 349 or § 350, a plaintiff must plausibly allege "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Suarez v. Cal. Nat. Living, Inc.*, 2019 U.S. Dist. LEXIS 34634 *1, *17 (S.D.N.Y. Mar. 4, 2019) (quoting *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)). A defendant's conduct is materially misleading if it "would mislead 'a reasonable consumer acting reasonably under the circumstances.'" *Bowring v. Sapporo U.S.A., Inc.*, 234 F. Supp. 3d 386, 390 (E.D.N.Y. 2017) (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015)). In determining whether a defendant's conduct is materially misleading, courts assess "each allegedly misleading statement in light of its context on the product label or advertisement as a whole." *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 53 (E.D.N.Y. 2015) (internal quotation marks and citations omitted). This determination by a court is an "objective inquiry" that is "typically unsuited to resolution at the pleading stage." *Suarez*, 2019 U.S. Dist. LEXIS 34634 at *17 (citing *Bowring*, 234 F. Supp 3d at 390).

Defendants do not challenge the first and third elements of Plaintiff's claims brought under NY GBL §§ 349–50, but only the second, arguing that "Potato Skins" is not a materially misleading misrepresentation. *See generally* Def. Mem. at 7–17. Defendants' arguments amount to the following: (a) Plaintiff has failed to allege that the Products are misleading because

4

Plaintiff has not adequately alleged that there are no potato skins in the Products, *see id.* at 14–17; and (b) there is nothing deceptive about the Products' labeling, so "Plaintiff's alleged experiences and expectation regarding the [Products] are unique to her and do not represent those experiences and expectations of a 'reasonable consumer.'" *Id.* at 6; *see also id.* at 6–14. These arguments are both unavailing.

### A. The Products Are Not Potato Skins

Defendant INVENTURE's statements in *The Cooking Channel* video prove beyond all doubt that the Products are not potato skins. The video also demonstrates that Defendants TGIF and INVENTURE work in concert to affirmatively manipulate the Products' non-potato skins ingredients in an effort to make them appear like real potato skins. Yet Defendants come back with the following pettifoggery: "To be sure, the alleged Inventure employee depicted in the *Cooking Channel* video does not state that there are potato skins in the [Products]. Significantly, he also does not state that there are no potato skins in the [Products]." Def. Mem. at 16. This argument is disingenuous given that the entire purpose of the video is to explain *how Defendants use non-potato skin ingredients to create an end-product that simulates the appearance of potato skins*.

At the outset, *The Cooking Channel* video notes that "[p]otato skins have been around for decades. But it wasn't until [TGI] Friday's put them on the menu in 1974 that they turned into a restaurant staple." *See* Am. Compl. ¶ 37 (quoting *The Cooking Channel* video at 0:22). The video also observes "Friday's teamed up with Indiana's Inventure Foods to create a more convenient, crunchier spin on this appetizer classic." *Id.* at 0:32. Yet the very title of the video clarifies that the "spin" is just that and no more: "Inventure's Potato Skin Chips are made from—what else? Corn, of course." Defendant INVENTURE's Plant Director, Adam Johnson ("Mr.

Johnson"), reinforces this claim in noting that the base ingredient for the Products is "whole dead corn." *Id.* at 0:49. Crucially, the narrator relates the following at 1:58: "*To make the potato skin chip to look more like a potato skin*, they actually create two separate batches of dough" (emphasis added). Mr. Johnson additionally states that caramel coloring is added to these batches of dough to further mimic the coloration of a natural potato skin. *Id.* at 2:06. As yet another deceptive business practice in the manufacturing of the Products, the flat sheets of the caramel-colored dough infused with corn "are *transformed* into potato skins" through Defendants' use of "a roller of potato chip-shaped cutters" designed "*to make these little chips even more authentic*." *Id.* at 2:50 (emphases added). Obviously, Defendants would not have to "transform" the ingredients into potato skins if the Products truly were potato skins. They would not have to "make" the chips authentic if they truly were authentic—that is, if they actually were what they purport to be.

Imagine your neighbors present you with freshly baked chocolate chip cookies. Finding them delicious, you ask them for the recipe. To which they respond, "flour, butter, eggs, sugar, chocolate chips, and a pinch of salt." After hearing these ingredients, any reasonable person would expect this to be the exhaustive list of ingredients. It would be anything but natural to think, "What other ingredients might my neighbor *not* be telling me about?" Yet Defendants urge precisely this logic upon the Court. Viewers of *The Cooking Channel* video evidently must, Defendants argue, suspend their judgment as to whether the Products contain potato skins, simply because Defendant INVENTURE's representative did not expressly state that potato skins are or are not in the Products, even though the video would make no sense at all if we were dealing with authentic potato skins.

Reasonable consumers expect a product labeled "Potato Skins" to *consist in* potato skins. But even if we assumed that a reasonable consumer merely expected the Product to include potato skins as merely one highly processed ingredient among others, Defendants would still be liable, as Plaintiff has plausibly alleged that potato skins are not present in the Products in any capacity whatsoever.

Defendants charge that "Plaintiff fails to articulate why she believes there are no potato skins in the [Products]. At most, she contends that the 'only potato-based ingredients in the Products are potato flakes and potato starch.'" Def. Mem. at 14 (quoting Am. Compl. ¶ 6). In support of their argument, Defendants cite 21 C.F.R. § 101.4 to note that "The common or usual name of a food, which may be a coined term, shall accurately identify or describe, *in as simple and direct terms as possible*, the basic nature of the food or its characterizing properties or ingredients" (emphasis added). *See* Def. Mem. at 15. Yet Defendants go on to make the following nonsensical claim: "Here, the most simple and direct terms to describe the potato-based ingredients in the [Products] are 'potato starch' and 'potato flakes.'" *Id.* This is nonsensical because the "most simple and direct" term to describe the primary ingredient in a Product labeled "POTATO SKINS" is "potato skins." The fact that Defendant fails to list "potato skins" as a primary ingredient, or even as *an* ingredient in the Products, indicates that the Products do not contain potato skins.

For that matter, Defendant's attempted analogy—that "[a]ny argument that potato skins should be separately identified in the ingredient list is akin to requiring the manufacturer of cherry pies to separately list cherry skin as an ingredient"—is equally unavailing. Def. Mem. at 15. Cherry skins are, patently enough, not the titular ingredient of a cherry pie—instead, it is cherries *as a whole*, and the components of a pie (flour, sugar, butter, eggs, etc.). A true analogy

7

would instead be that a manufacturer of apple skins snack chips, and who markets the chips as "Apple Skins," should list as its primary ingredient "apple skins" to comport with 21 C.F.R. § 101.4, as that would be the "most simple and direct" term to describe the ingredient.

Defendants' citations to *Parks v. Ainsworth Pet Nutrition, LLC*, 377 F. Supp. 3d 241 (S.D.N.Y. 2019) and *Alaei v. Kraft Heinz Food Co.*, No. 15-CV-2961, 2016 Dist. LEXIS 63914 at *1 (S.D. Cal. Apr. 22, 2016) are misguided. Defendant cites *Parks* for the proposition that the plaintiff there failed to sufficiently allege how the inclusion of a "natural" label on a line of premium dog food products containing trace amounts of herbicides was materially misleading under NY GBL §§ 349–50. The facts at issue in *Parks* are readily distinguishable from those in the instant action. First, Plaintiff's allegations do not concern a vaguely defined term such as "natural." Instead, this case concerns Defendants' straightforward representation that the Products are "POTATO SKINS," when in fact they are not. Second, this case does not concern the presence of a potentially harmful ingredient, such as an herbicide, that would impact the meaning of Defendants' "POTATO SKINS" representation. What is instead at issue here is the fact that Defendant's representation is false simply because its titular ingredient is wholly absent from the Products' composition.

Defendant's reliance on *Alaei* is similarly misplaced. There, the plaintiff claimed the defendant's "Made in the USA" representation on its sauce product was misleading because a number of its ingredients—such as turmeric, tamarind extract, and jalapenos—"are not from the United States." *See Alaei*, 2016 Dist. LEXIS 63914 at *6–*7. The plaintiff's consumer fraud claim was dismissed because, among other pleading deficiencies, she did not specify which components of the sauce were purportedly made outside of the United States. *See id.* at *7. The instant action has nothing to do with the origins of imported ingredients, and how they may

affect a product's representation concerning the territory where it was manufactured. Plaintiff's claim is, by contrast, much more straightforward: the Products are deceptively labeled by Defendants as "POTATO SKINS" because they are not potato skins. The absence of "potato skins" as an ingredient in the Products is one of the bases supporting Plaintiff's allegations in this regard. Two additional grounds supporting Plaintiff's claim that the Products do not contain potato skins are addressed below.

While Defendants argue that the potato starch and potato flakes in the Products might include potato skins, Plaintiff cites numerous authorities that describe how a potato's skin is removed during the manufacturing of potato starch and potato flakes. *See, e.g.*, *id.* ¶ 41 ("Starch is typically isolated from cull potatoes, surplus potatoes, and waste streams . . . They are then disintegrated by a saw blade resp or hammer mill, and the mashed product is *screened to remove skins and fiber*.") (emphasis added); ¶ 43 ("Potato flakes are dehydrated mashed potatoes made by drum drying . . . . **Processing**: Raw potatoes should be washed to remove adhering soil . . . . *Peeling may be done by any process* . . . .").

Defendants seek to undermine the weight of the authorities Plaintiff cites by seizing on irrelevant details which in no way undermine the validity of Plaintiff's claims regarding standard potato starch and potato flake manufacturing processes. For example, Defendant notes that *PotatoPro.com*, cited at Am. Compl. ¶ 45 n.13, describes potato flake manufacturing practices in India, while another of Plaintiff's sources, listed at Am. Compl. ¶ 42 n.10, is prepared for the Environmental Protection Agency's ("EPA") Office of Air Quality Planning and Standards. *See* Def. Mem. at 16. These observations by Defendants do not respond to the substance of Plaintiff's allegations—that the standard manufacturing processes for potato starch and potato flakes involve the removal of a potato's skin. The fact that such a process may also take place in India

does not alter the truth of that fact. Nor does Plaintiff's argument solely rely on this source to make her claims regarding potato flakes manufacturing. *See* Am. Compl ¶¶ 43–44 n.11–12. (citing the *Encyclopedia of Food Sciences and Nutrition*, and *Waste Treatment in the Process Industries: 6 Potato Wastewater Treatment*, respectively). In addition, Defendant's argument entirely overlooks that the report submitted to the EPA's Office of Air Quality Planning and Standard is titled, "Starch Manufacturing: A Profile," and therefore speaks directly to Plaintiff's claims regarding the potato starch manufacturing processes. Indeed, the specific diagram Plaintiff has attached to her Amended Complaint as Exhibit D is taken from this report, and it presents a clear visual regarding the removal of a potato's skin in the potato starch manufacturing process. *See also* Am. Compl., Ex. E (providing similar image for potato skin removal in the potato flake manufacturing process).

Defendants also erroneously suggest that "[t]here is not a single allegation in the FAC, however, that ties these manufacturing processes to the [Products] and ingredients used therein." This is patently false. Plaintiff TRONCOSO stated at numerous points throughout her Amended Complaint that the only potato-based ingredients in the Products are potato starch and potato flakes. *See, e.g.*, Am. Compl. ¶¶ 6, 36, 40, 52. At paragraph 40, Plaintiff directly ties this fact to the lack of potato skins in the Products: "The only potato-based ingredients found in the Products are potato starch and potato flakes, which do not include potato skins, as shown by the potato starch and potato flakes manufacturing processes described below. *See also id.* ¶¶ 46–47 (after providing an overview of how the potato starch and potato flake manufacturing processes "involve the removal of a potato's skin," Plaintiff went on to allege that "[t]herefore, the potato starch and potato flakes in the Products do not contain potato skins.").

At a minimum, Plaintiff's allegations regarding the standard manufacturing processes for potato starch and potato flakes gives rise to the strong inference that the Products do not contain potato skins. Yet if there is any lingering doubt as to whether the Products in fact contain potato skins, a review of the Products' ingredients statement, as well as *The Cooking Channel* video, dispels any such notion. Therefore, the three grounds Plaintiff has advanced in the Amended Complaint—individually, and certainly when considered all together—are sufficiently pled in support of Plaintiff's central allegation that the Products are not potato skins.

**B. The Reasonable Consumer Would Be Deceived by the Products' Labeling**

Since Plaintiff's allegation that the Products do not consist in, or even contain, potato skins, are obviously well-pled, Defendants are forced to resort to the specious argument that reasonable consumers would never think otherwise and accordingly are not deceived by its representations. Yet the bottom line is that "POTATO SKINS" is placed just above a picture of what Defendants themselves boast are designed to appear like potato skins, and adjacent to Defendant TGIF's iconic logo, which is intended to endow the misrepresentation with additional credibility. *See* Am. Compl., Ex. A. at 1, 3, 5. As noted, Defendant TGIF "claims to have come up with the potato skin in 1974," *see* Am. Compl. ¶ 59, and is the company that first put the potato skins appetizer "on the menu in 1974 [and] turned it into a restaurant staple." *See id.* ¶ 37.

Plaintiff TRONCOSO is one of the countless number of consumers familiar with Defendant TGIF's reputation with potato skins. *See* Am. Compl. ¶ 24 ("Plaintiff was aware of TGIF's famous restaurant potato skins appetizer and assumed that the Product was derived from them."). Although Defendants insist that Plaintiff's views are somehow unique in expecting the Products to be derived from Defendant TGIF's potato skins appetizer. The *Cooking Channel* video states: "Friday's teamed up with Indiana's Inventure Foods *to create a more convenient,*

11

*crunchier spin on this appetizer classic*." *See* Am. Compl. ¶ 37 (quoting *The Cooking Channel* video at 0:22) (emphasis added). In relying on Product's deceptive labeling when making her purchase, Plaintiff TRONCOSO did no more than buy into the very message that Defendants actively perpetuate—namely, that the Products are genuine potato skins derived from TGIF's appetizer classic. The placement of the "POTATO SKINS" representation just below Defendant TGIF's logo is additionally deceptive because it falsely reassures consumers that they are receiving a bona fide potato skins product from the company responsible for popularizing potato skins. There is therefore nothing outlandish about Plaintiff's expectation that the Products are potato skins, and it is exactly the type of expectation that Defendants actively seek to inculcate in consumers. Nevertheless, Defendant attempts to support is claims with a variety of tendentious arguments, which Plaintiff will not rebut.

1. It Is Reasonable to Expect That the Products Contain Genuine Potato Skins Derived from TGIF's Appetizer Classic

Defendants stress the fact that the Products are available for purchase at convenience stores such as the gas station in the Bronx where Plaintiff made her purchase. Defendants rely on this fact to cast aspersions on Plaintiff's reasonable belief that the Products are derived from Defendant TGIF's potato skins appetizer: "Plaintiff asks the Court to accept her allegation that she believed the following two products—[a potato skins appetizer] being ordered and professionally prepared in a restaurant and the [Product] being purchased from an unrefrigerated shelf at a gas station for $1.99—were the same." Def. Mem. at 13. Plaintiff here notes that Defendant does not cite any language from the Amended Complaint suggesting that Plaintiff believes that potato skins appetizers and the Products are "the same." This is because Plaintiff never made any such claim. As the actual language from the Amended Complaint quoted by Defendant makes clear, Plaintiff reasonably believed that the Products were *derived from* TGIF's

potato skins appetizer. *See* Def Mem. at 12 (quoting Am. Compl. ¶ 37 ("Plaintiff paid the advertised price for the Product on the assumption that she was purchasing a snack food consisting of authentic potato skins with a genuine potato skins taste—that is, a product that was *actually derived from TGIF's famous potato skins appetizer*.") (emphasis added)).

Plaintiff's interpretation is entirely consistent with Defendants *own* characterization of the Products as "a more convenient, crunchier spin on this appetizer classic." *See* Am. Compl. (quoting *The Cooking Channel* video at 0:22). Whether using Plaintiff's term of "derived," or Defendants' term, "spin," both are used to connote the same overall message: the Products are intended to serve as a snack food derivative of TGIF's famous potato skins appetizers. Given that Defendant TGIF has presumably only ever used authentic potato skins in their restaurant appetizers, *see, e.g.*, Am. Compl. ¶ 59 (TGIF describing its history of inventing potato skins with, "one of our cooks was making our mashed potatoes in the back of the house, and decided to drop *the potato skin* in the fryer"), consumers like Plaintiff would have absolutely no reason to believe that the Products are uniquely devoid of potato skins. Accordingly, Plaintiff's views regarding the Products are consistent with what any reasonable consumer would believe in viewing the Products' labeling: the Products are real potato skins designed to be a "more convenient, crunchier spin" on Defendant's TGIF's appetizer classic.

2.   It Is Reasonable to Expect That the Products Taste Like a Snack Food Equivalent of TGIF's Appetizer Classic

Defendants' also protests that no reasonable consumer would expect the Products to taste anything like TGIF's potato skins appetizer, *see* Def. Mem. at 11–12, is a strawman. Defendants state that "it is beyond cavil that no reasonable consumer would believe that an unrefrigerated, shelf-stable bag of Snack Chips sold in a gas station for $1.99 would have the same or even

13

similar taste of a warm freshly-prepared potato skins appetizer ordered from a restaurant that contains toppings such as cheese, bacon, and a dipping sauce." *Id.* at 12.

Yet Defendants do not and cannot cite to such an outlandish claim or language in the Amended Complaint. Instead, Plaintiff has merely stated that she, like any reasonable consumer viewing the Product's labeling, would believe that the Products "deliver the taste of genuine potato skins, as popularized by TGIF through its restaurants' potato skins appetizers." Am Compl. ¶ 10. *See also id.* ¶ 63 ("Plaintiff paid the advertised price for the Products on the assumption that she was purchasing a snack food consisting of authentic potato skins with a genuine potato skins taste—that is, a product that was actually derived from TGIF's famous potato skins appetizer."). Of course, turning a potato skin into a snack food is going to alter its taste. But there remains a meaningful difference in taste between a genuine potato skins snack and a mash-up of corn and potato starch, which is what Defendants offer. Defendants' suggestion that it is unreasonable to expect *any* resemblance at all between the taste of a potato skin snack and a restaurant potato skin is inconsistent with its own marketing message according to which the Products are a "more convenient, crunchier spin" on the TGIF classic.

3.  Defendants' "Gas Station" Argument Presents a Factual Question Not Resolvable on a Motion to Dismiss

At numerous points, Defendants suggest that the Products' availability for sale at a gas station should have alerted Plaintiff, and does alert reasonable consumers, that the Products could not possibly consist in actual potato skins. Defendants will of course be free to retain consumer behavior experts to substantiate this strange and entertaining hypothesis at trial. But the question cannot be adjudicated on a motion to dismiss.

14

4.   The Nutritional Value of Potato Skins Is Material

Defendants argue that the nutrition value of potato skins could not be material to a reasonable consumer and, therefore, that its deception was immaterial as well. First, Plaintiff stresses that this is not the only source of the deception's materiality, since taste is material as well, as explained above. Defendants claim that Plaintiff could have looked to the nutrition panel to learn of the Products nutrients. But reasonable consumers are not required to look to nutritional panels to dispel reasonable inferences generated by unambiguous front-label representations. *See Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008) ("We disagree with the district court that reasonable consumers should be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box."); *Delgado v. Ocwen Loan Servicing, LLC*, No. 13-CV-4427 (NGG) (RML), 2014 U.S. Dist. LEXIS 135758, at *24 (E.D.N.Y. Sep. 23, 2014) ("[a] solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures.") (quoting *F.T.C. v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006))

Moreover, the Products' nutrition panel is not comprehensive. For example, Amended Complaint ¶ 58 n.15 alleges that potato skins are a significant source of niacin. Yet the Products' do not address niacin one way or the other. It is not listed as 0% or as any other number, so the nutrition panel would not by itself disabuse a reasonable consumer of the thought that a product called "POTATO SKINS" actually consisted in potato skins. Defendants also argues that reasonable consumers know better than to think that snack foods are adequate nutritional substitutes for actual meals. This is another of Defendants' many strawmen, as Plaintiff never alleged otherwise. Snack foods cannot substitute for meals, but there remain significant

15

differences in the nutritional values of different snack foods, and it is not unreasonable for consumers to care about these differences, even if the nutritional contributions of snack foods be deemed "incidental" to those of full-on meals.

## II.  PLAINTIFF HAS ADEQUATELY PLED A COMMON LAW FRAUD CLAIM

The only basis on which Defendants challenge Plaintiff's fraud claim is "because her GBL claims are insufficiently pled." Def. Mem. at 17. However, for the reasons set forth above, Plaintiff has more than plausibly alleged that the Products are not potato skins. Therefore, Defendants' attempted argument to undermine Plaintiff's fraud claim collapses alongside Defendants' NY GBL arguments that the Product is not deceptively labeled to reasonable consumers.

It is also clear from the reasons set forth above that Plaintiff has sufficiently alleged that Defendants acted with intent to deceive consumers regarding the Products. For example, Defendants' representations on their Amazon seller webpages include such falsehoods as: "TGI Fridays Cheddar and Bacon Potato Skins feature tasty potatoes and *real potato skins*." *See* Am. Compl. ¶ 54, Ex. C (emphasis added). Furthermore, the entirety of *The Cooking Channel* video demonstrates that Defendants actively make a concerted effort to deceive consumers into believing that the Products are potato skins through the use of caramel food coloring and specialized chip cutting tools. *See* Am. Compl. ¶ 37.

Plaintiff additionally notes here that she cites Defendants' Amazon.com seller webpages primarily to demonstrate Defendants' intent to defraud consumers. *See* Def. Mem. at 23 ("References to Amazon.com's website cannot form the basis of Plaintiff's claims"). Defendants' Amazon webpages may also be probative as to whether a reasonable consumer would be deceived by the misrepresentations made therein regarding the Products.

## III. PLAINTIFF HAS STATED CLAIMS AGAINST TGIF

The foregoing sections illustrate that Defendant TGIF is a properly named Defendant in this matter. Defendants attempt to argue that Defendant TGIF should be dismissed from the instant action because it "merely licensed its name for the [Products]." Defendant additionally claims that TGIF is, at most, liable under a theory of "vicarious liability," which would still be insufficient to sustain "an unfair competition claim." Def. Mem. at 19, citing *Parent v. Millercoors LLC*, No. 15-CV-1204, 2016 WL 3348818 (S.D. Ca. June 16, 2016).

Yet Defendant TGIF is far from a mere licensor in this action. As *The Cooking Channel* video makes clear, Defendant TGIF has "teamed up" with Defendant INVENTURE to manufacture the Products. *See* Am. Compl. ¶ 37. That is, Defendant TGIF is *directly*, not vicariously, liable for its deceptive manufacturing practices regarding the manufacture, marketing, and sale of the Products. Additionally, Defendant TGIF markets the deceptively labeled Products on their Amazon seller's webpage. *See* Am. Compl., Ex. B. As yet another deceptive act, Defendant TGIF falsely represents on its Amazon webpage that the Products contain "Real Potato Skins." *See id.* These are not the acts of a mere licensor, but rather a Defendant who is properly named in this action due to its active role in deceiving consumers into believing that the Products are potato skins.

## IV. PLAINTIFF HAS STATED CLAIMS AGAINST UTZ

Defendant claims that Plaintiff has not adequately stated a claim against Defendant UTZ "because it is sued only in its capacity as the parent company of Inventure." Def. Mem. at 19. However, Defendant neglects to mention Plaintiff's allegation that "Defendant UTZ manufactures and distributes the Products through its subsidiary, Defendant INVENTURE. In fact, even the website address, https://www.inventurefoods.com, redirects to Defendant UTZ's

website. Furthermore, the Products are marketed and available for sale through UTZ's website." Am. Compl. ¶ 31. Plaintiff's allegations indicate that Defendant UTZ exercises considerable control over Defendant INVENTURE, since Defendant INVENTURE does not separately maintain its own website, but automatically redirects to Defendant UTZ'. Plaintiff's allegations also make clear that Defendant UTZ can be held directly liable for marketing and selling the deceptively labeled Products on its own website. Plaintiff additionally notes here that the question of the degree to which Defendant UTZ exercises control over Defendant INVENTURE is a question of fact that should be resolved beyond this motion to dismiss.

## V.  PLAINTIFF HAS STANDING TO SEEK INJUNCTIVER RELIEF

Defendants argue that Plaintiff lacks standing to pursue injunctive relief because there is no indication that Plaintiff intends to purchase the Product again, and so Plaintiff is unlikely to suffer any future injury. *See* Def. Mem. at 21–23. However, this argument ignores that "an injunction in connection with a class action is designed to afford protection of future consumers from the same fraud. It does this by permitting the plaintiff to sue on their behalf." *Belfiore v. Procter & Gamble Co.*, F. Supp. 3d 440, 445 (E.D.N.Y. 2014). To hold otherwise "denigrate[s] the New York consumer protection statute, designed as a major support of consumers who claim to have been cheated." *Id. See Delgado v. Ocwen Loan Servicing Company, LLC*, 2014 U.S. Dist. LEXIS 135758, 2014 WL 4773991, at *42 (E.D.N.Y. Sept. 23, 2014) ("Finding that Plaintiffs have no federal standing to enjoin a deceptive practice once they become aware of the scheme would eviscerate the intent of the California legislature in creating consumer protection statutes.") (internal quotation marks and citation omitted); *Ackerman v. Coca-Cola Co.*, 2013 U.S. Dist. LEXIS 184232, 2013 WL 7044866, at *56 n.23 (E.D.N.Y. July 17, 2013) ("[C]ourts have consistently held that plaintiffs have standing to seek injunctive relief based on the allegation that

18

a product's labeling or marketing is misleading to a reasonable consumer. To hold otherwise would 'effectively bar any consumer who avoids the offending product from seeking injunctive relief.'") (quoting *Koehler v. Litehouse, Inc.*, 2012 U.S. Dist. LEXIS 176971, 2012 WL 6217635, at *6 (N.D. Cal. Dec. 13, 2012)).

Some have argued that the policy considerations behind state consumer protection laws must yield to the Constitution. But there is no conflict between the two. The Supreme Court has held that "[t]he standing inquiry focuses on whether the plaintiff is the proper party to bring this suit." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). This formulation thus presupposes that the proper party *exists*: the reference is to *the* proper party, whomever that happens to be, not to *a* proper party, who might or might not exist. This is consistent with the reasoning of courts that have held injunctive relief to be appropriate in consumer fraud class actions. Given the specific issue intrinsic to these cases—that anyone who becomes aware of the deception and so is positioned to bring a complaint is unlikely to be duped again—the usual application of the standing rule must be adjusted accordingly if there is ever to be a proper party, which *Raines* indicates there must be. *See Ries v. Arizona Bevs. USA LLC*, 287 F.R.D. 523, 533–34 (N.D. Cal. 2012) ("As plaintiffs further note, were the Court to accept the suggestion that plaintiffs' mere recognition of the alleged deception operates to defeat standing for an injunction, then injunctive relief would never be available in false advertising cases, a wholly unrealistic result."); *Henderson v. Gruma Corp.*, 2011 U.S. Dist. LEXIS 41077, 2011 WL 1362188 at *7 (C.D. Cal. Apr. 11, 2011) ("If the Court were to construe Article III standing for FAL and UCL claims as narrowly as the Defendant advocates, federal courts would be precluded from enjoining false advertising under California consumer protection laws because a plaintiff who had been injured would always be deemed to avoid the cause of the injury thereafter ('once bitten, twice shy') and would never have Article III

standing."); *Fortyune v. American Multi-Cinema, Inc.*, 2002 U.S. Dist. LEXIS 27960, 2002 WL 32985838, *7 (C.D. Cal. Oct. 22, 2002) ("If this Court rules otherwise [and does not find standing], like defendants would always be able to avoid enforcement of the ADA. This court is reluctant to embrace a rule of standing that would allow an alleged wrongdoer to evade the court's jurisdiction so long as he does not injure the same person twice.").

In the consumer fraud context, the proper party to request injunctive relief is the party that already has standing to request other forms of relief arising out of the same case or controversy. This is the best conceivable party given the very nature of the cause of action and the public interest. Article III does not require more than this. The alternative is a state of affairs in which those who need and are entitled to injunctive relief are unable to act on that right while those who have the knowledge to do so are legally disqualified from doing so.

## VI. NY GBL STATUES MAY BE APPLIED EXTRATERRITORIALLY

Plaintiff notes as an initial matter that the determination as to whether her NY GBL claims may be applied extraterritorially should be resolved on a Rule 23 motion for class certification. At that stage of the litigation, the state of New York's interest in this case can be properly evaluated. Yet even if New York law cannot be applied extraterritorially to non-New York class members, Plaintiff nonetheless has standing to assert other state's consumer protection laws on behalf of non-New York class members. *See Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 92–93 (2d Cir. 2018) ("[A]s long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance under Rule 23(b)(3)") (internal citations omitted).

## <u>CONCLUSION</u>

For all the foregoing reasons, Defendants' Motion to Dismiss is meritless and should be denied.

Dated: October 15, 2019

Respectfully submitted,

**LEE LITIGATION GROUP, PLLC**

*/s/ C.K. Lee*
By:  C.K. Lee, Esq.

C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, Eighth Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 15, 2019, true and correct copies of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss The First Amended Complaint Class were served on counsel of record via ECF.

/s/ C.K. Lee
C.K. Lee, Esq.