UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SOLANGE TRONCOSO, *on behalf of herself and others similarly situated*,

Plaintiff,

-v.-

TGI FRIDAY'S INC., INVENTURE FOODS, INC., and UTZ QUALITY FOODS, LLC,

Defendants.

19 Civ. 2735 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Solange Troncoso purchased a bag of snack chips labeled "TGI Fridays Potato Skins Snacks," believing the chips to contain real potato skins. She later learned, to her dismay, that they did not. This class action lawsuit followed. Specifically, Plaintiff sued Inventure Foods, Inc. ("Inventure"), the company that manufactures the snack chips; Utz Quality Foods, LLC ("Utz"), the parent company of Inventure; and TGI Friday's Inc. ("TGIF"), which licenses its trademark and brand name to Inventure for display on the snack chips (together, "Defendants"). Under a theory of diversity jurisdiction, Plaintiff asserts state-law claims for false and deceptive advertising under New York General Business Law ("GBL") §§ 349 and 350, as well as a claim for common-law fraud. Defendants move to dismiss the complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, or in the alternative, to dismiss Utz and TGIF as Defendants. Defendants also move to dismiss Plaintiff's claim seeking injunctive relief for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). For the reasons set forth in the

remainder of this Opinion, Defendants' motion to dismiss is granted with respect to Plaintiff's claims against Utz and TGIF, and granted with respect to Plaintiff's claim for injunctive relief, but is otherwise denied.

## BACKGROUND[1]

### A.      Factual Background

Plaintiff is a resident of New York.  (Am. Compl. ¶ 23).  Inventure is a corporation that is incorporated in Delaware and headquartered in Arizona. (*Id.* at ¶ 27).  Utz is a corporation that is incorporated in Delaware and headquartered in Pennsylvania.  (*Id.* at ¶ 30).  Inventure operates as a wholly owned subsidiary of Utz.  (*Id.* at ¶ 29).  TGIF is a corporation that is incorporated in New York and headquartered in Dallas.  (*Id.* at ¶ 25).

TGIF is a restaurant chain that sells an appetizer named "Potato Skins" as an item on its menu.  (Am. Compl. ¶¶ 8, 9).  Each individual Potato Skin begins with a thick slice of a potato, including the flesh and peel of the potato. (*Id.* at ¶¶ 8-10, 12).

Inventure manufactures and produces a line of snack chips (the "snack chips"), the packaging of which displays the label "TGI Fridays Potato Skin Snacks," along with a description of the flavor of the particular snack chips

---

[1]      This Opinion draws its facts from Plaintiff's Amended Complaint ("Amended Complaint" or "Am. Compl." (Dkt. #17)), the well-pleaded allegations of which are taken as true for purposes of this motion, and the exhibits attached to the Amended Complaint.

For convenience, the Court refers to Defendants' Memorandum of Law in Support of Their Motion to Dismiss as "Def. Br." (Dkt. #26); Plaintiff's Memorandum of Law in Opposition to the Motion as "Pl. Opp." (Dkt. #27); and Defendants' Reply Memorandum of Law in Support of Their Motion as "Def. Reply" (Dkt. #28).

contained therein, *e.g.*, "Bacon Ranch Flavor." (Am. Compl. ¶¶ 2, 28). TGIF licenses its trademarked brand name to Inventure for marketing of the snack chips, and the trademark is displayed on the packaging of the chips. (*Id.* at ¶ 26).

 

(*Id.* at Ex. A).

On June 30, 2018, Plaintiff purchased a bag of the snack chips at a New York gas station for $1.99. (Am. Compl. ¶¶ 23, 24). In making her decision to purchase the snack chips at that price, Plaintiff relied on the label on the packaging. (*Id.*). This packaging caused her to believe that the snack chips were "derived from" TGIF's Potato Skins appetizer, "consist[ed] of" potato skins, and contained potato skins as an ingredient. (*Id.* at ¶¶ 24, 35). Plaintiff's belief that the snack chips contained potato skins was reinforced by: (i) her knowledge of TGIF's Potato Skins appetizer; and (ii) the picture on the front of the packaging, which picture she understood to display potato skins. (*Id.* at

¶¶ 3, 24, 34).  Plaintiff claims that TGIF sells the snack chips on its Amazon.com product page, along with a representation that the chips contain "Real Potato Skins," but she does not allege that she saw this product page before she purchased the chips.  (*Id.* at ¶ 54).

Since purchasing the snack chips in 2018, Plaintiff alleges that she has learned that the chips do not consist of potato skins, nor do they contain potato skins as an ingredient.  (Am. Compl. ¶¶ 5, 24).  The only potato-based ingredients in the snack chips are "potato flakes" and "potato starch," neither of which, Plaintiff alleges, contains the peels from potatoes.  (*Id.* at ¶¶ 7, 36-49).  Plaintiff claims that, had she known that the snack chips do not contain potato skins, she would not have purchased the product or would not have paid the price premium charged.  (*Id.* at ¶¶ 12, 24).  Since learning that the snack chips do not contain potato skins, Plaintiff has ceased to purchase the product; she further relates that she would not rely on the truthfulness of representations regarding the snack chips, absent corrective changes to their packaging and labeling.  (*Id.* at ¶ 24).

## B.   Procedural Background

Plaintiff filed her original Complaint on March 27, 2019.  (Dkt. #1).
Defendants filed a letter on May 23, 2019, seeking a pre-motion conference concerning their anticipated motion to dismiss.  (Dkt. #10).  The Court granted Defendants' application for a pre-motion conference on May 29, 2019, and the conference was held on June 25, 2019.  (Dkt. #14; Minute Entry for June 25, 2019 Proceedings).  During that conference, the Court granted Plaintiff leave to

file an amended complaint to address some of the issues raised in Defendants'
pre-motion letter.  (Minute Entry for June 25, 2019 Proceedings).

Plaintiff filed her Amended Complaint on July 11, 2019.  (Dkt. #17).  On
August 12, 2019, Defendants notified the Court that they wished to file a
motion to dismiss the Amended Complaint.  (Dkt. #23).  On August 19, 2019,
the parties presented a proposed briefing schedule concerning Defendants'
anticipated motion to dismiss that the Court adopted the same day.  (Dkt. #24,
25).  Defendants filed their motion to dismiss, with an accompanying
memorandum of law, on September 17, 2019.  (Dkt. #26).  Plaintiff filed her
opposition papers on October 16, 2019.  (Dkt. #27).  Defendants filed their
reply brief on October 29, 2019. (Dkt. #28).

## DISCUSSION

### A.    The Court Grants Defendants' Rule 12(b)(1) Motion to Dismiss Plaintiff's Claim for Injunctive Relief

Among other forms of relief, Plaintiff seeks to enjoin Defendants from
labeling, packaging, or marketing the snack chips as "Potato Skins" pursuant
to GBL § 349  (Am. Compl. ¶¶ 84-93).  Defendants counter that Plaintiff lacks
standing to seek injunctive relief, and moves to dismiss this claim for lack of
subject matter jurisdiction pursuant to Federal Rule of Procedure 12(b)(1).
(Def. Br. 21-23).

### 1.    Motions Under Federal Rule of Civil Procedure 12(b)(1)

Rule 12(b)(1) permits a party to move to dismiss a complaint for "lack of
subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  "A case is properly
dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the

district court lacks the statutory or constitutional power to adjudicate it."
*Lyons* v. *Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016)
(quoting *Makarova* v. *United States,* 201 F.3d 110, 113 (2d Cir. 2000)).

The Second Circuit has identified two types of Rule 12(b)(1) motions:
facial and fact-based. *See Carter* v. *HealthPort Techs., LLC,* 822 F.3d 47, 56-57
(2d Cir. 2016); *see also Katz* v. *Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d
Cir. 2017). A facial Rule 12(b)(1) motion is one "based solely on the allegations
of the complaint or the complaint and exhibits attached to it." *Carter*, 822 F.3d
at 56. A plaintiff opposing such a motion bears "no evidentiary burden." *Id.*
Instead, to resolve a facial Rule 12(b)(1) motion, a district court must
"determine whether [the complaint and its exhibits] allege[ ] facts that"
establish subject matter jurisdiction. *Id.* (quoting *Amidax Trading Grp.* v.
*S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam)). And to make
that determination, a court must accept the complaint's allegations as true
"and draw[ ] all reasonable inferences in favor of the plaintiff." *Id.* at 57
(internal quotation marks and citation omitted).

"Alternatively, a defendant is permitted to make a fact-based Rule
12(b)(1) motion, proffering evidence beyond the complaint and its exhibits."
*Carter*, 822 F.3d at 57; *see also MMA Consultants 1, Inc.* v. *Rep. of Peru*, 719 F.
App'x 47, 49 (2d Cir. 2017) (summary order) (defining fact-based Rule 12(b)(1)
motion as one where "the defendant puts forward evidence to challenge the
factual contentions underlying the plaintiff's assertion of subject-matter
jurisdiction"). "In opposition to such a motion, [a plaintiff] must come forward

with evidence of their own to controvert that presented by the defendant, or may instead rely on the allegations in the[ir p]leading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Katz*, 872 F.3d at 119 (internal citations and quotations omitted). If a defendant supports his fact-based Rule 12(b)(1) motion with "material and controverted" "extrinsic evidence," a "district court will need to make findings of fact in aid of its decision as to subject matter jurisdiction." *Carter*, 822 F.3d at 57.

### 2. Plaintiff Lacks Standing to Pursue Injunctive Relief

Federal courts are courts of limited jurisdiction, "and lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Platinum-Montaur Life Scis., LLC* v. *Navidea Biopharmaceuticals, Inc.*, 943 F.3d 613, 616 (2d Cir. 2019). Article III of the Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies,'" thereby "restrict[ing] the authority of federal courts to resolving 'the legal rights of litigants in actual controversies.'" *Genesis Healthcare Corp.* v. *Symczyk*, 569 U.S. 66, 71 (2013) (internal quotation marks omitted) (quoting *Valley Forge Christian College* v. *Americans for Separation of Church and State, Inc.*, 454 U.S. 471 (1982)). The "Cases and Controversies" requirement places the burden on "those who invoke the power of a federal court to demonstrate standing — a 'personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Already, LLC* v. *Nike, Inc.*, 568 U.S. 85, 90 (2013).

In order to satisfy the first prong of standing — that the plaintiff has suffered an "injury in fact" — the plaintiff "must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.* v. *Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  Moreover, "[t]o establish standing to obtain prospective relief, a plaintiff 'must show a likelihood that he will be injured in the future.'"  *Carver* v. *City of New York*, 621 F.3d 221, 228 (2d Cir. 2010) (quoting *Shain* v. *Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)).  Either there must be a "substantial risk" that the future injury will occur, or the threatened injury must be "certainly impending."  *Susan B. Anthony List* v. *Driehaus*, 573 U.S. 149, 158 (2014).  "'[A]llegations of *possible* future injury' are not sufficient," *Clapper* v. *Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013) (emphasis in original), nor is "past exposure to illegal conduct," *City of Los Angeles* v. *Lyons*, 461 U.S. 95, 102 (1983) (internal brackets omitted) (quoting *O'Shea* v. *Littleton*, 414 U.S. 488, 495 (1974)).

Defendants argue that Plaintiff cannot show that she is likely to suffer any future injury because she alleged that she has ceased purchasing the snack chips and will not rely on any representations made by Defendants concerning the snack chips until their packaging is modified so that it no longer includes a misrepresentation.  (Def. Br. 21-23; Am. Compl. ¶ 24).  Plaintiff contends that this misstates the law, and points to a series of cases,

most prominently *Belfiore* v. *Procter & Gamble, Co.*, 94 F. Supp. 3d 440, 445 (E.D.N.Y. 2015) ("*Belfiore I*"), for support.  (Pl. Opp. 18).

It is true that the court in *Belfiore I* found the plaintiff there to have standing to seek injunctive relief on behalf of a putative class, even if the plaintiff would not attempt to buy the product in the future, because the plaintiff was suing on behalf of future consumers to protect them from the same fraud perpetuated against the plaintiff.  94 F. Supp. 3d at 445.  The court's decision was based heavily on public policy, with the court stating that to deny the plaintiff standing "would denigrate the New York consumer protection statute."  *Id.*  But the court reached this conclusion only after acknowledging that the Second Circuit had "apparently not yet directly addressed the issue of whether a plaintiff, with no claim of probable future injury, may pursue an injunction under state consumer protection statutes."  *Id.* at 444.

The Second Circuit has since spoken.  In 2016, the Court reaffirmed that "[a] plaintiff seeking to represent a class must personally have standing." *Nicosia* v. *Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (quoting *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996)); *see also O'Neill* v. *Standard Homeopathic Co.*, 346 F. Supp. 3d 511, 527 (S.D.N.Y. 2018) ("Moreover, because Plaintiffs do not individually have standing to seek injunctive relief, they do not have standing to seek injunctive relief on behalf of a putative ... class." (internal quotation marks and brackets omitted) (quoting *Buonasera* v. *Honest Co., Inc.*, 208 F. Supp. 3d 555, 565 (S.D.N.Y. 2016))).  The Second Circuit went on to hold that

9

where a plaintiff fails to allege that she intends to use the offending product in the future, there is no likelihood of future harm and the plaintiff lacks standing to seek injunctive release on behalf of a class.  *Nicosia*, 834 F.3d at 239.

As other courts in this Circuit have acknowledged, *Nicosia* trumps the public policy rationale presented in *Belfiore I*.  *See Bernardino* v. *Barnes & Noble Booksellers, Inc.*, No. 17 Civ. 4570 (LAK) (KHP), 2017 WL 3727230, at *6 (S.D.N.Y. Aug. 11, 2017) (finding that *Nicosia* had effectively overruled decisions holding that a plaintiff could seek injunctive relief on behalf of a class, even where the plaintiff would not suffer future harm), *report and recommendation adopted*, No. 17 Civ. 4570 (LAK), 2017 WL 3726050 (S.D.N.Y. Aug. 28, 2017); *see also Kommer* v. *Bayer Consumer Health*, 252 F. Supp. 3d 304, 309-10 (S.D.N.Y. 2017) (same), *aff'd*, 710 F. App'x 43 (2d Cir. 2018) (summary order).  That is, irrespective of the logic of Plaintiff's public policy arguments, *Nicosia* is binding precedent.  Plaintiff failed to allege an intent to purchase the snack chips in the future, and therefore she has not established a likelihood of future injury sufficient to show standing.[2]  Her claim for injunctive relief is accordingly dismissed.

---

[2]     The Second Circuit recently noted that "[w]hether plaintiffs seeking injunctive relief for consumer deception have standing where they allege that they would buy the products in the future if not mislabeled is unsettled in this Circuit.  *Axon* v. *Florida's Nat. Growers, Inc.*, — F. App'x —, No. 19-203-cv, 2020 WL 2787627, at *4 (2d Cir. May 29, 2020) (summary order).  Plaintiff did not allege that she would purchase the snack chips in the future if their labeling is corrected, so the Court need not weigh in on this unsettled area of the law.

**B.      The Court Grants in Part and Denies in Part Defendants'
         Rule 12(b)(6) Motion**

Defendants next seek dismissal of the Complaint — the consumer

protection claims under GBL §§ 349 and 350 and the claim for common-law

fraud — pursuant to Rule 12(b)(6).  In brief, Defendants argue that Plaintiff has

failed to plausibly allege that a reasonable person would be misled by

misrepresentations that appear on the packaging of the snack chips.  (Def.

Br. 6-17).  In the alternative, Defendants seek to have Utz and TGIF dismissed

as defendants, on the ground that Plaintiff has not plausibly alleged that either

of these parties was responsible for any alleged misrepresentation on the snack

chips' packaging.

**1.      Motions to Dismiss Under Federal Rule of Civil
         Procedure 12(b)(6)**

When considering a motion to dismiss under Federal Rule of Civil

Procedure 12(b)(6), a court must "draw all reasonable inferences in Plaintiff's

favor, assume all well-pleaded factual allegations to be true, and determine

whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life

Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted);

*see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  A plaintiff is entitled to

relief if he alleges "enough facts to state a claim to relief that is plausible on its

face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re

Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does

not require heightened fact pleading of specifics, it does require enough facts to

nudge plaintiff's claims across the line from conceivable to plausible." (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 570)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.  This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  "Plausibility ... depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc.* v. *Old Navy, LLC,* 647 F.3d 419, 430 (2d Cir. 2011).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### 2.   Plaintiff Has Stated a Claim Under GBL §§ 349 and 350

"The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to § 349," *Goshen* v. *Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 n.1 (2002), and therefore the Court will merge its analysis of the two claims.  In order to plead a sufficient claim under either provision, "a plaintiff must allege that the defendant [i] engaged in

consumer-oriented conduct; [ii] that the conduct was materially misleading; and [iii] that the plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Weisblum* v. *Prophase Labs. Inc.*, 88 F. Supp. 3d 283, 292 (S.D.N.Y. 2015). Plaintiff is not required to meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) for her claims. *See Daniel* v. *Mondelez Int'l, Inc.*, 287 F. Supp. 3d 177, 186 (E.D.N.Y. 2018).

Defendants argue that Plaintiff has failed to plausibly allege that any misleading representation was made.[3] "To establish that conduct is misleading, a plaintiff must demonstrate that a reasonable consumer would likely be misled by the alleged misrepresentation." *Sitt* v. *Nature's Bounty, Inc.*, No. 15 Civ. 4199 (MKB), 2016 WL 5372794, at *8 (E.D.N.Y. Sept. 26, 2016). "Courts view each allegedly misleading statement in light of its context on the product label or advertisement as a whole." *Belfiore* v. *Procter & Gamble, Co.*, 311 F.R.D. 29, 53 (E.D.N.Y. 2015) (internal quotation marks omitted) (quoting *Delgado* v. *Ocwen Loan Servicing, LLC*, No. 13 Civ. 4427 (NGG) (RLM), 2014 WL 4773991, at *8 (E.D.N.Y. Sept. 24, 2014)). "The entire mosaic is viewed rather than each tile separately." *Id.* (internal quotation marks omitted) (quoting *Time Warner Cable, Inc.* v. *DIRECTV, Inc.*, No. 06 Civ. 14245 (LTS) (MHD), 2007 WL 1138879, at *4 (S.D.N.Y. Apr. 16, 2007)). Courts have recognized that the

---

[3]     Defendants argue that Plaintiff's claims should be dismissed because she failed to plausibly allege that their conduct was misleading. (Def. Br. 5-17). Defendants do not contest whether any of the alleged misrepresentations was material. *See In re Sling Media Slingbox Advert. Litig.*, 202 F. Supp. 3d 352, 360 (S.D.N.Y. 2016) (observing that a "material claim is one that involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product" (quoting *Bildstein* v. *MasterCard Int'l Inc.,* 329 F. Supp. 2d 410, 414 (S.D.N.Y. 2004)). Therefore, the Court does not address the materiality *vel non* of any putative misrepresentation.

"reasonable consumer" inquiry is typically a question of fact, *see Sitt*, 2016 WL 5372794, at *8 (quoting *Hidalgo* v. *Johnson & Johnson Consumer Cos., Inc.*, 148 F. Supp. 3d 285, 295 (S.D.N.Y. 2015)), to be decided at a later stage in the proceeding.  That said, in appropriate circumstances, a "court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer."  *Fink* v. *Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013).

### a.    Plaintiff's Theory of the Case

As an initial matter, Defendants argue that the Amended Complaint does not clearly allege precisely how Plaintiff was misled by the snack chips' packaging.  (Def. Br. 7).  Defendants argue that Plaintiff has potentially alleged that she and other reasonable consumers were misled into believing that: (i) the snack chips tasted like the Potato Skins appetizer that one could order inside a TGIF's restaurant; (ii) the snack chips were a genuine Potato Skins appetizer that one could order inside a TGIF's restaurant; or (iii) the snack chips were healthier than they actually are.  (*Id.*).

The Court agrees that the Amended Complaint is noticeably, and perhaps intentionally, imprecise as to Plaintiff's theory of the case.  At times, the Amended Complaint alleges that Plaintiff believed that the snack chips were "a snack food consisting of authentic potato skins with a genuine potato skins taste — that is, a product that was actually derived from TGIF's famous potato skins appetizer."  (Am. Compl. ¶ 63).  At other times, Plaintiff alleges that she believed the snack chips were "comprised of skins peeled from

potatoes." (*Id.* at ¶ 4).  In still other instances, Plaintiff alleges that she believed that the snack chips contained potato skins as an ingredient.  (*Id.* at ¶ 24).  Plaintiff's opposition brief does little to clarify matters, announcing merely that "[r]easonable consumers expect a product labeled 'Potato Skins' to consist in potato skins.  But even if we assumed that a reasonable consumer merely expected the Product to include potato skins as merely one highly processed ingredient among others, Defendants would still be liable."  (Pl. Opp. 7).  And the confusion created by Plaintiff's inconsistent usage of phrases such as "consisting of," "consist in," and "derived from" is only exacerbated by the fact that potato skins might refer to the skin peelings of potatoes, or it might refer to thick slices of potatoes that include both potato flesh and peels.[4]

Ultimately, the Court will not waste words parsing Plaintiff's intent.  To the extent Plaintiff alleges that a reasonable consumer could believe that the snack chips would taste identical to or would actually be identical to the TGIF Potato Skins appetizer, such a claim is dismissed for failure to state a claim.[5] "A reasonable consumer does not lack common sense."  *Daniel* v. *Mondelez Int'l, Inc.*, 287 F. Supp. 3d 177, 193 (E.D.N.Y. 2018); *see Weinstein* v. *eBay*,

---

[4]     To avoid confusion, for the remainder of this Opinion the Court will refer to TGIF's appetizer as sold in restaurants as its "Potato Skins appetizer."  The Court will refer to the thick slices of potatoes, including their flesh and peel, which serve as the base of the TGIF's Potato Skins appetizer, as potato skins.  And the Court will refer to the skin peelings of a potato as potato peel.

[5]     Plaintiff argues that she did not expect the snack chips to taste *identical* to a TGIF Potato Skins appetizer, but that a reasonable customer would expect some resemblance between the taste of the two products.  (Pl. Opp. 14).  But Plaintiff has not plausibly alleged the lack of resemblance in taste between the two products, nor has she plausibly alleged that only a product containing potato peels could in any way replicate the taste of the TGIF Potato Skins appetizer.

*Inc.*, 819 F. Supp. 2d 219, 228 (S.D.N.Y. 2011) ("[T]he applicable legal standard is whether a reasonable consumer, not the least sophisticated consumer, would be misled by Defendants' actions.").   No reasonable consumer would believe that the snack chips, shelf-stable and sold at room temperature in gas stations, would be identical in taste or substance to an appetizer, prepared with perishable dairy products and served hot in a restaurant.

What is more, to the extent that Plaintiff alleges that a reasonable consumer could believe that the snack chips would contain thick slices of potato skins, that claim is also dismissed.   No reasonable consumer viewing the picture on the front of the snack chips' packaging could believe that the snack chips were thick slices of potato skins.   Finally, to the extent that Plaintiff argues that a reasonable consumer could believe that the snack chips are "derived from" the TGIF Potato Skins appetizer, the claim is dismissed. (Am. Compl. ¶ 12; Pl. Opp. 3).   Plaintiff has made no effort to define what "derived from" means in this context; it could mean that the snack chips are the result of some chemical process performed on the TGIF Potato Skins appetizer, or it could mean that the snack chips were merely inspired by the appetizer.   In short, Plaintiff has failed to plead any of these three theories with the specificity required to move her allegations across the line from possible to plausible, as is required to survive a motion to dismiss.   *See In re Elevator Antitrust Litig.*, 502 F.3d at 50.

Despite this imprecision, the Amended Complaint can reasonably be read to assert a claim that Plaintiff was misled into believing that the snack chips

contain potato peels as an ingredient.  (*See* Am. Compl. ¶ 4 ("The image of the Product in these photos, placed just below large font stating "Potato Skins," leads reasonable consumers to believe that the Products are comprised of skins peeled from potatoes."); *see also id.* at ¶ 5 ("However, the Products are not made from the skin peelings of potatoes.  Nor do they contain potato skins as even one ingredient among others.")).  The remainder of this Opinion will address this one potentially plausible theory of the case.[6]

---

[6]  Defendants devote a significant portion of their briefing to addressing what they believe is Plaintiff's primary argument: that Plaintiff claimed she was misled into believing that the snack chips were nutritious because they contained potato peels.  (Def. Br. 7-11).  But Defendants misconstrue the meaning of Plaintiff's allegations concerning the nutrition of potato peels; Plaintiff did not allege that she was misled into believing that the snack chips were a significant source of vitamins or minerals.  She mentions nutritional qualities only in the context of offering one reason why consumers would pay a price premium for a snack chip that contained potato peels.  (Am. Compl. ¶ 58).  In other words, Plaintiff's allegations concerning nutrition go to materiality, an element of her claims that Defendants do not contest has been satisfied.  Thus, unlike the cases cited by Defendants, the gravamen of the Amended Complaint is that Defendants' conduct is misleading because it led her to believe that the snack chips contained potato peels as an ingredient, not that she was misled into believing the snack chips were healthy.  (*See* Def. Br. 10 (citing *Red* v. *Kraft Foods, Inc.*, No. 10 Civ. 1028 (GW), 2012 WL 5504011, at *3 (C.D. Cal. Oct. 25, 2012) (addressing situation in which the plaintiff's theory of the case was that a product was healthy))).

Further, Defendants' arguments that Plaintiff could not have been misled about the nutritional value of the snack chips because the snack chips' packaging contained a nutritional panel is incorrect.  Plaintiff alleges that potato peels are known to contain certain minerals not present in potato flesh, such as niacin, and niacin levels are not reported on the nutritional panel of the snack chips' packaging.  (Am. Compl. ¶ 58).  Consulting the nutritional panel would not have alerted Plaintiff to the possibility that she would not receive the dose of niacin that she would expect in a product containing potato peels.  Thus, Defendants' citation to *Reyes* v. *Crystal Farm Refrigerated Distribution Company*, No. 18 Civ. 2250 (NGG) (RML), 2019 WL 3409883 (E.D.N.Y. July 26, 2019), for the proposition that a reasonable consumer purchasing snack chips for their nutritional value would check the nutritional panel on the packaging is not relevant here.  (Def. Br. 8).

### b.   Plaintiff Plausibly Alleges That Reasonable Consumers Would Likely Believe the Snack Chips Contain Potato Peels

Having determined that Plaintiff's theory of the case is that she was misled into believing that the snack chips contained potato peels, the Court next looks to whether that theory is plausibly alleged in the Amended Complaint.  Defendants argue that Plaintiff has not met this burden, because she had not plausibly alleged either: (i) that a reasonable consumer would believe that the snack chips contain potato peels based on representations made to Plaintiff; and (ii) that the snack chips do not in fact contain potato peels, such that any statements to the contrary were misleading.  (Def. Br. 6-17).  The Court addresses each of these arguments in turn.

*First*, to establish that advertising is misleading, "plaintiffs must do more than plausibly allege that a 'label might conceivably be misunderstood by some few consumers.'"  *Jessani* v. *Monini N. Am., Inc.*, 744 F. App'x 18, 19 (2d Cir. 2018) (summary order) (quoting *Ebner* v. *Fresh Inc.*, 838 F.3d 958, 965 (9th Cir. 2016)).  Instead, "[p]laintiffs must plausibly allege 'that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled.'"  *Id.*  The only statements that Plaintiff alleges might have been materially misleading are those that appeared on the packaging of the snack chips.[7]  Those statements include the

---

[7]   Plaintiff notes that TGIF's Amazon web page includes a representation that the snack chips contain "Real Potato Skins."  (Am. Compl. ¶ 54).  But Plaintiff does not allege that she viewed TGIF's Amazon web page before deciding to purchase the snack chips, or that she relied on that statement when purchasing the snack chips.  (*See generally* Am. Compl.; Def. Br. 23).  In order to plead a § 349 or § 350 claim successfully, Plaintiff must allege that she saw the misleading statements of which she complains before she

label of the packaging, which reads "TGI Fridays Potato Skin Snacks."  The Court finds that a significant portion of reasonable consumers reading a label for a "Potato Skin Snacks" product could believe that the snack chips contain potato peels as an ingredient.

Of course, such labeling would only be misleading if the snack chips did not, in fact, contain potato peels.  On this point, Defendants argue that Plaintiff has not plausibly alleged that the snack chips do not contain potato peels. (Def. Br. 14-17).  The Court disagrees.  The Amended Complaint does not merely present a bald assertion that the snack chips do not contain potato peels; it includes factual allegations to support this assertion.  Plaintiff notes that the only potato-based ingredients in the snack chips are potato starch and potato flakes.  (Am. Compl. ¶¶ 6, 36, 40).  And Plaintiff provides descriptions of how potato starch and potato flakes are made — drawn from outside sources, such as the *Encyclopedia of Food Sciences and Nutrition*, a report generated by the Research Triangle Institute for the Environmental Protection Agency, and *PotatoPro.com* — which suggest that they are created from potatoes that have been peeled, *i.e.*, that neither potato starch nor potato flakes contain potato

---

purchased or came into possession of the snack chips.  *See Tyman* v. *Pfizer, Inc.*, No. 16 Civ. 6941 (LTS) (BCM), 2017 WL 6988936, at *24 (S.D.N.Y. Dec. 27, 2017), *report and recommendation adopted*, No. 16 Civ. 6941 (LTS) (BCM), 2018 WL 481890 (S.D.N.Y. Jan. 18, 2018); *Goldemberg* v. *Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 480 (S.D.N.Y. 2014).  Section 350 requires a plaintiff to plead that she relied on a defendant's statements at the time of purchase, *Horowitz* v. *Stryker Corp.*, 613 F. Supp. 2d 271, 288 (E.D.N.Y. 2009), but § 349 does not require reliance, *see Belfiore* v. *Proctor & Gamble Co.*, 94 F. Supp. 3d 440, 446 (E.D.N.Y. 2015).  Section 349 does, however, require that a plaintiff plead causation, *see Belfiore*, 94 F. Supp. 3d at 446, and thus the pleading requirements end up being much the same, *see Tyman*, 2017 WL 6988936, at *24.

peels. (*Id.* at ¶¶ 40-47).[8]  Further, Plaintiff provides the transcript of a video

presented on the Cooking Channel's website, in which the plant director for

Inventure is interviewed regarding the manufacturing process for the snack

chips. (*Id.* at ¶¶ 37-39).  In describing the composition of the snack chips and

the ways in which they are designed to appear similar to potato skins, neither

the plant director nor the narrator mentions that the snack chips contain

actual potato peels. (*Id.*).[9]  These pieces of evidence would not suffice to prove

definitively that the snack chips do not contain potato peels.  But they do serve

to "nudge [P]laintiff's claims across the line from conceivable to plausible." *In

re Elevator Antitrust Litig.*, 502 F.3d at 50 (internal quotation marks omitted).

Defendants' arguments to the contrary are premised on inapposite case

law.  Defendants cite to *Reyes* v. *Crystal Farm Refrigerated Distribution

Company*, a case in which the plaintiff bought a package of ready-to-eat

mashed potatoes with the label "made with real butter," but which stated in its

list of ingredients that the mashed potatoes contained margarine.  No. 18 Civ.

2250 (NGG) (RML), 2019 WL 3409883 (E.D.N.Y. July 26, 2019).  The plaintiff

argued that the "made with real butter" label was misleading because it caused

her to believe the product did not contain margarine. *Id.*  The court found that

---

[8]     Defendants argue that they had no obligation to list potato skins or peels as a separate
ingredient on the snack chips' packaging. (Def. Br. 14-15).  The crux of this argument
is that the presence of potato skins or peels is covered by one of the other ingredients
listed on the packaging.  But Plaintiff plausibly alleges that the other potato-based
ingredients do not include potato peels, thus permitting a reasonable inference that the
snack chips do not in fact contain potato peels.

[9]     Plaintiff argues that this video "prove[s] beyond all doubt that the [snack chips] are not
potato skins." (Pl. Opp. 5).  It does prove that the snack chips are not TGIF's Potato
Skins appetizers and that they are not whole potato skins.  But the video merely
suggests, and does not prove, that the snack chips do not contain potato peels.

the label was not misleading.  *Id.* at *3-4.  The product did contain butter, and "to the extent that including a label on a mashed-potatoes package indicating that the product is 'made with real butter' may create confusion as to whether the mashed potatoes also contain margarine, such confusion is sufficiently dispelled by the ingredients label on the back of the package" that specifically listed margarine as an ingredient.  *Id.* at *3.

The Court does not find *Reyes* to be instructive.  The label on the front of the snack chips' packaging would lead a reasonable customer to believe that the product contained potato peels, and, unlike in *Reyes*, that impression would not have been dispelled by any other statement on the packaging.  The list of ingredients did not clarify that the product did not contain potato peels; it stated that the snack chips contained potato starch and potato flakes.  (Am. Compl. ¶ 36).  A reasonable consumer would not understand that potato starch and potato flakes could not contain potato peels, and thus would not believe that the list of ingredients reversed the label's representation that the product contains potato peels.

Defendants also cite approvingly to *Parks* v. *Ainsworth Pet Nutrition, LLC*, a case in which a consumer brought an action for false advertising based on his objection to the labeling of a premium dog food as "natural," when it contained trace amounts of an herbicide.  377 F. Supp. 3d 241, 247-48 (S.D.N.Y. 2019).  But the plaintiff did not allege that the amounts of herbicide present in the product would be harmful.  *Id.* at 247.  The court found that "a reasonable consumer would not be so absolutist as to require that 'natural'

means there is no glyphosate, even an accidental and innocuous amount," and thus that the "natural" label was not misleading. *Id.* Unlike in *Parks*, where the plaintiff alleged that a representation led her to believe that the product would contain no herbicides at all, the representations at issue here led Plaintiff to believe, reasonably, that the snack chips would contain potato peels as an ingredient. In other words, a reasonable consumer *would* be so absolutist as to require the snack chips to at least contain some amount of potato peels. If the snack chips did not contain potato peels, representations that led consumers to believe otherwise would be misleading.

Finally, Defendants' reply brief relies heavily upon *Tarzian* v. *Kraft Heinz Foods Co.*, No. 18 Civ. 7148 (CPK), 2019 WL 5064732 (N.D. Ill. Oct. 9, 2019), a case in which the plaintiff alleged that the defendant's product, which claimed to have "no artificial preservatives," was misleading because it contained citric acid, a chemical that is typically, though not always, produced through an artificial industrial fermentation process, as opposed to a natural process. *Id.* at *4. The court found that the plaintiff had failed to plead that the citric acid in the product was produced through industrial, rather than natural, methods and thus did "not link the allegedly artificial citric acid to the actual citric acid used." *Id.* This Court does not quarrel with the logic behind the decision in *Tarzian*, but it does not help Defendants here. Though Defendants may disagree, Plaintiff has alleged that the snack chips do not contain potato peels based in part on allegations that the potato-based ingredients in the chips definitionally do not contain potato peels. (Am. Compl. ¶¶ 40-47). Thus,

Plaintiff has satisfactorily alleged a nexus between a lack of potato peels and the snack chips in question. *Cf. Tarzian*, 2019 WL 5064732, at *4 ("Because Plaintiffs' allegations do not link the allegedly artificial citric acid to the actual citric acid used by Kraft, Plaintiffs have failed to allege sufficient facts showing that Kraft's 'no artificial preservatives' statement was false.").

For these reasons, the Court cannot conclude as a matter of law that a significant portion of the general consuming public would not read the snack chips' labeling and reasonably believe that the products contain potato peels as an ingredient. And Plaintiff has plausibly alleged that the snack chips do not, in fact, contain potato peels. Thus, Defendants' motion to dismiss Plaintiff's GBL §§ 349 and 350 claims on the ground that Plaintiff failed to plausibly allege that the snack chips' packaging is misleading is denied.[10]

### 3.    Plaintiff Has Stated a Claim for Common-Law Fraud

Defendants also argue that Plaintiff fails to state a claim for common-law fraud under New York law. (Am. Compl. ¶¶ 113-18). To establish a claim, Plaintiff must allege: "[i] Defendant[s] made a material false representation; [ii] Defendant[s] intended to defraud Plaintiff[] thereby; [iii] Plaintiff[] reasonably

---

[10]    In their opening brief, Defendants argued that any claims under GBL §§ 349 and 350 brought by potential class action members who purchased the chips outside of New York should be dismissed, because those statutes do not apply to out-of-state transactions. (Def. Br. 24-25). Plaintiff disagreed, arguing that disputes concerning the scope of the GBL §§ 349 and 350 claims as to putative class action members should be resolved at the class certification stage. (Pl. Opp. 20). Defendants did not raise this particular argument again in their reply brief, and thus the Court understands that they have abandoned it. (*See* Def. Reply). Even if they had not abandoned it, any motion to dismiss claims brought by potential class action members would be denied at this time. Such claims are purely hypothetical at this point in the litigation: no claim involving the purchase of chips outside of the state of New York has been presented to the Court. Given this, it is more prudent for the Court to wait to address this argument only if it becomes relevant.

relied on the representation; and [iv] Plaintiff[] suffered damage as a result of such reliance." *Sprint Sols., Inc.* v. *Sam*, 206 F. Supp. 3d 755, 764 (E.D.N.Y. 2016). Defendants argue that Plaintiff's fraud claim must fail, because she failed to plausibly allege that a misrepresentation had been made. (Def. Br. 17). For the reasons outlined in the preceding section, the Court disagrees: Plaintiff has plausibly alleged that the packaging contained a false representation that the snack chips contained potato peels, and that she reasonably relied upon that representation.[11] Defendants' motion to dismiss Plaintiff's common-law fraud claim is denied.

### 4.   Plaintiff Fails to State a Claim Against Defendants TGIF and Utz

Assuming, as the Court has found, that Plaintiff plausibly alleged that the snack chips' packaging misled her into believing that the snack chips contained potato peels, Defendants argue in the alternative that TGIF and Utz should be dismissed from the suit. (Def. Br. 17-20). According to Defendants, while Inventure manufactured and produced the snack chips, and thus plainly played a part in any misleading statements made on their packaging, TGIF merely licensed its name and trademark to Inventure, and Utz was nothing more than Inventure's parent company. (*Id.*). Without more, Defendants argue, Plaintiff has failed to plausibly allege that a nexus exists between TGIF and Utz, and any misleading statements on the packaging. The Court agrees.

---

[11]   To the extent Plaintiff raises a common-law fraud claim under the theory that she was misled into believing that the snack chips tasted like or were identical to TGIF's Potato Skins appetizer, or that the snack chips were thick slices of potato skins, Plaintiff's claim is dismissed. For the reasons addressed above, Plaintiff could not have reasonably relied upon any such representation.

### a.   The Court Dismisses the Action as to Defendant TGIF

As discussed above, Plaintiff claims that she was misled by labeling on the snack chips' packaging.  TGIF may be liable for that misleading labeling under GBL §§ 349 and 350 and principles of common-law fraud only if it engaged in making the misleading labeling.  *See Weisblum*, 88 F. Supp. 3d at 292 (noting that GBL §§ 349 and 350 require that the defendant engaged in misleading consumer-oriented conduct); *see also Sprint Sols., Inc.*, 206 F. Supp. 3d at 764 (noting that common-law fraud requires that the defendant made a materially false representation).

Plaintiff alleges that the snack chips are marketed under TGIF's trademarked brand name, and that TGIF has "control over the marketing of the" snack chips.  (Am. Compl. ¶ 26).  But the fact that TGIF has licensed its trademark to Inventure does not suggest that TGIF was involved in any aspects of the labeling beyond its own trademark, which Plaintiff does not allege is misleading.  And Plaintiff's allegation that TGIF had control over the marketing of the chips — and thus, presumably, the snack chips' misleading labeling — is wholly conclusory.

On this point, the Court finds instructive two cases cited by Defendants: *Hilsley* v. *General Mills, Inc.*, 376 F. Supp. 3d 1043, 1051 (S.D. Cal. 2019), and *Parent* v. *Millercoors LLC*, No. 15 Civ. 1204 (GPC) (WVG), 2016 WL 3348818, at *7 (S.D. Cal. June 16, 2016).  In *Hilsley*, a plaintiff argued that labeling that appeared on a fruit snack's packaging was misleading, and brought a suit under California consumer protection laws against a company that licensed its

trademarked cartoon characters to appear on the fruit snack's packaging, but did not itself manufacture the fruit snacks. 376 F. Supp. 3d at 1051. The court found that the plaintiff's allegations that the defendant was responsible for the labels, merely because its trademarked property appeared on the products, was too conclusory to state a claim for relief. *Id.*

In *Parent*, the plaintiff brought suit against a defendant that had licensed its trademark to appear on advertisements, produced by a third party, that the plaintiff argued were misleading. 2016 WL 3348818, at *7. The plaintiff brought a false advertising claim under California law against the defendant, alleging that the misleading advertisements bearing the defendant's trademark must have been made with the defendant's knowledge and consent. The court dismissed the claim, finding that the "use of a trademark does not constitute an endorsement." *Id.* (quoting *Emery* v. *Visa Internet. Serv. Ass'n*, 95 Cal. App. 4th 952, 960 (2002)).

Though both *Hilsley* and *Parent* were decided by courts in the Ninth Circuit and apply California law instead of New York law, the Court agrees with the premise on which they rest: an allegation that a party has licensed its trademark to appear on a product is not, by itself, sufficient to state a claim for liability for misleading representations that appear on that product.

Plaintiff's arguments against dismissal of TGIF as a defendant in this action draw upon her allegations that TGIF sells the snack chips on its Amazon web page along with a representation that the chips contain real potato skins.

26

(Pl. Opp. 17).[12]  But Plaintiff does not allege that she viewed this page or that she relied upon its representations before purchasing the snack chips.  (*See generally* Am. Compl.).  Thus, she has failed to state a claim against TGIF in connection with representations made on its Amazon web page.

### b.    The Court Dismisses the Action as to Defendant Utz

Plaintiff's efforts to drag Utz into the lawsuit are similarly flawed.  At base, Plaintiff's claims against Utz are based upon allegations that: (i) Inventure Foods is a "wholly owned subsidiary" of Utz; (ii) Utz "manufactures and distributes the [snack chips] through its subsidiary"; (iii) Inventure's website redirects to Utz's website; and (iv) Utz sells the snack chips on its own website.  (Am. Compl. ¶ 31).  But none of these claims is sufficient to establish that Utz was itself involved with the allegedly misleading labels on the snack chips.  After all, "[i]t is fundamental that a parent is considered a legally separate entity from its subsidiary, and cannot be held liable for the subsidiary's actions based solely on its ownership of a controlling interest in the subsidiary."  *N.Y. State Elec. & Gas Corp.* v. *FirstEnergy Corp.*, 766 F.3d 212, 224 (2d Cir. 2014) (citing *United States* v. *Bestfoods*, 524 U.S. 51, 65 (1998)).  And Plaintiff's allegations do not otherwise give rise to a reasonable inference that Utz was engaged in the allegedly misleading labeling of the snack

---

12      Plaintiff also argues that the video presented on the Cooking Channel's website includes dialogue that states that TGIF has "teamed up" with Inventure to produce the snack chips.  (Pl. Opp. 17).  But this statement is vague and does not suggest that TGIF controlled the labeling on the snack chips.  Furthermore, it was not made by a representative of TGIF or Inventure.  (Am. Compl. ¶ 37).  Thus, it does not give rise to a "reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

chips.  The allegation that Utz "manufactures and distributes the snack chips through" Inventure is conclusory, and the allegations concerning Utz's website do not suggest that it was engaged in creating the allegedly misleading labeling.

Even if not engaged in the allegedly misleading conduct, Utz might still be liable if Plaintiff had plausibly alleged that the corporate veil should be pierced.  Under New York law, a parent can be held liable for the actions of a subsidiary where a plaintiff shows: "[i] the parent corporation dominates the subsidiary in such a way as to make it a "mere instrumentality" of the parent; [ii] the parent company exploits its control to "commit fraud or other wrong"; and [iii] the plaintiff suffers an unjust loss or injury as a result of the fraud or wrong."  *N.Y. State Elec. & Gas Corp.*, 766 F.3d at 224.  To determine whether a parent corporate dominates its subsidiary, New York courts will consider factors including:

> [i] the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, [ii] inadequate capitalization, [iii] whether funds are put in and taken out of the corporation for personal rather than corporate purposes, [iv] overlap in ownership, officers, directors, and personnel, [v] common office space, address and telephone numbers of corporate entities, [vi] the amount of business discretion displayed by the allegedly dominated corporation, [vii] whether the related corporations deal with the dominated corporation at arms length, [viii] whether the corporations are treated as independent profit centers, [ix] the payment or guarantee of debts of the dominated corporation by other corporations in the group, and [x] whether the corporation in question had

28

> property that was used by other of the
> corporations as if it were its own.

*Id.* (quoting *Wm. Passalacqua Builders, Inc.* v. *Resnick Developers S., Inc.,* 933 F.2d 131, 138 (2d Cir. 1991)).

Plaintiff's opposition brief suggests that her claims against Utz should survive by piercing the corporate veil that separates Utz and Inventure.  (Pl. Opp. 17-18 ("Plaintiff's allegations indicate that Defendant Utz exercises considerable control over Defendant Inventure.")).  Acknowledging the fact that a "veil-piercing attack in particular is a 'fact-laden' claim" that may not be suited to dismissal before discovery, *Nat'l Gear & Piston, Inc.* v. *Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 411 (S.D.N.Y. 2013), the Court nonetheless concludes that any veil-piercing theory as to Utz must be dismissed.  Plaintiff's only allegation concerning Utz's control of Inventure is that Inventure's website redirects to Utz's.  (Am. Compl. ¶ 31).  Plaintiff does not cite to a single case that suggests that the sharing of a website establishes that a parent dominates its subsidiary for veil-piercing purposes — indeed, Plaintiff cites no case law in the lone paragraph she devotes to arguing that Utz should not be dismissed as a defendant.  (Pl. Opp. 17-18).  And the Court is unaware of any such case.  To the contrary, the cases found by the Court suggest that a shared website by parent and a subsidiary does not amount to domination sufficient to justify piercing the corporate veil.  *See, e.g.*, *Liverpool* v. *Con-Way Inc.*, No. 08 Civ. 4076 (JG) (JO), 2009 WL 1362965, at *8 (E.D.N.Y. May 15, 2009) (finding that an assertion that a parent and subsidiary shared a website was not sufficient to allege that the parent operated the subsidiary with "sufficient disregard for

29

its distinct corporate identity" to maintain a theory of corporate veil piercing); *see also Bridge* v. *New Holland Logansport, Inc.*, 815 F.3d 356, 364 (7th Cir. 2016) (declining to pierce the corporate veil where parent and subsidiary shared similar names, shared directors, shared certain employees' services, used the same address on their tax returns, and shared a website); *Marks* v. *Worldwide Robotic Automated Parking, LLC*, No. 16 Civ. 8656 (RMD), 2017 WL 2985757, at *5 (N.D. Ill. July 13, 2017) (same); *Muniz* v. *Walgreen Co.*, 46 F. Supp. 3d 117, 124 (D.P.R. 2014) (declining to pierce the corporate veil despite plaintiff's allegations that, among other things, the parent and subsidiary shared a website).

The Court agrees with the well-reasoned analyses provided in these cases. The Amended Complaint is devoid of "solid, nonconclusory allegations" that would support corporate veil piercing. *Robles* v. *Copstat Sec., Inc.*, No. 08 Civ. 9572 (SAS), 2009 WL 4403188, at *2 (S.D.N.Y. Dec. 2, 2009) (quoting *Moses* v. *Martin,* 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004)). Thus, Defendants' motion to dismiss Plaintiff's claims against Utz is granted.

## CONCLUSION

For the reasons set forth in this Opinion, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART. Defendants Utz and TGIF are DISMISSED from this case. Defendant Inventure's motion to dismiss is GRANTED with respect to Plaintiff's claim for injunctive relief. Defendants' motion is otherwise DENIED. The Clerk of Court is directed to terminate the motion at docket entry 26.

On or before **June 29, 2020**, Defendant shall file a responsive pleading.

On or before **July 8, 2020**, the parties shall submit a proposed Case Management Plan, as well as the joint status letter contemplated by the Plan.

SO ORDERED.

Dated:   June 8, 2020
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge